WEISS & JONES
Philip E. Weiss, Esq.
1551 Shelter Island Drive
San Diego, California 92106
Telephone: (619) 225-8884
Facsimile: (619) 225-8801

Attorneys for Plaintiff
Bartell Hotels, a California Limited Partnership,
dba Half Moon Anchorage

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARTELL HOTELS, A California Limited Partnership, dba HALF MOON ANCHORAGE, <br><br> Plaintiff, <br><br> v. <br><br> M/Y CLAIRE IRENE, a 1968 Owens Motor Yacht of Approximately 40-Feet In Length And 11-Feet In Beam, Bearing California D.M.V. Registration No. CF 8646 ED, AND ALL OF HER ENGINES, TACKLE, ACCESSORIES, EQUIPMENT, FURNISHINGS AND APPURTENANCES, *in rem*, <br><br> Defendant. | Case No. 07CV 2097 L (BLM) <br><br> IN ADMIRALTY <br><br> FIRST AMENDED VERIFIED COMPLAINT FOR VESSEL ARREST, INTERLOCUTORY SALE AND FOR MONEY DAMAGES FOR TRESPASS BY VESSEL, BREACH OF CONTRACT FOR NECESSARIES, AND *QUANTUM MERUIT* <br><br> F.R.C.P. Supplemental Admiralty Rules C and E. |

Plaintiff alleges:

## JURISDICTION

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and jurisdiction is based on 28 U.S.C. section 1333(1).

Plaintiff brings this action on its own behalf and on behalf of all parties who were, are or may

become interested in all or part of the *res* which is the subject of this litigation, as their

interests may appear.

///

///

FIRST AMENDED VERIFIED COMPLAINT FOR VESSEL ARREST,
INTERLOCUTORY SALE AND FOR MONEY DAMAGES FOR TRESPASS, BREACH OF,
CONTRACT FOR NECESSARIES AND QUANTUM MERUIT,                    -1-

Case No. 07CV2097L (BLM)

**PARTIES**

2.    Plaintiff BARTELL HOTELS, a California Limited Partnership, dba HALF
MOON ANCHORAGE ("PLAINTIFF"), is a California Limited Liability Partnership, duly
organized and existing by virtue of law.  It maintains a leasehold interest in that certain 180-
slip marina known as "Half Moon Anchorage," located at 2303 Shelter Island Drive, San
Diego, California (hereinafter the "Marina").

3.    The DEFENDANT VESSEL, is a 40-foot 1968 Owens motor yacht.  She has
not been maintained for years, is of wooden construction and PLAINTIFF believes and
alleges she is currently unfit for her intended purpose, and hence that she unseaworthy as a
matter of law.  PLAINTIFF is informed, believes and alleges that on one occasion the former
marina owner's employees were forced to dewater the DEFENDANT VESSEL, to prevent
her from sinking.  She is now or formerly was registered with the California Department of
Motor Vehicles under CF No. CF 8646 ED.

4.    The DEFENDANT VESSEL is now within the waters of the Southern District
of California and within the admiralty jurisdiction of this Honorable Court.  The
DEFENDANT VESSEL is neither now, nor has she at any relevant time been, equipped with
a permanent continuous hookup to a shoreside sewage system, and therefore as a statutory
matter she is not and cannot be a "floating home" within the meaning of the California
Floating Home Residency Law (Cal. Civil Code section 800.4). The wharfage contract
pursuant to which the DEFENDANT VESSEL has occupied space at the Marina is hence an
ordinary commercial contract which is freely terminable.  Derfus v. Far West Villa Del Mar,
Ltd., 471 F. Supp. 1082 (C.D.C.A.  1979) (so recognizing, rejecting argument boat owner is
entitled to notice of good cause for termination and opportunity for impartial hearing, and
holding "[t]he right to dock one's boat at a particular berth or marina cannot be equated with
the right to decent low-cost housing even if one chooses to live aboard the boat.").  No one is
believed to live aboard the DEFENDANT VESSEL.

///

///

FIRST AMENDED VERIFIED COMPLAINT FOR VESSEL ARREST,
INTERLOCUTORY SALE AND FOR MONEY DAMAGES FOR TRESPASS, BREACH OF,
CONTRACT FOR NECESSARIES AND QUANTUM MERUIT,                    Case No. 07CV2097L (BLM)

-2-

1    5.    The DEFENDANT VESSEL is believed to be owned by Mr. Kurt Hach, who is

2    not a party to this action, which is brought solely *in rem*.

3    **FIRST COUNT**

4    **(Trespass – Against Defendant Vessel)**

5    6.    PLAINTIFF refers to Paragraphs 1 through 5 of this Verified Complaint and

6    incorporates them as though fully set forth herein.

7    7.    PLAINTIFF purchased the former owner's interest in Half Moon Anchorage

8    (hereinafter the "Marina") in January, 2007.  At that time the DEFENDANT VESSEL had

9    already been there for years, apparently since at least 2001.  PLAINTIFF believes and

10   alleges, based on its review of an accounting history relating to the DEFENDANT VESSEL

11   that, since March, 2001, the account for the DEFENDANT VESSEL has been arrears on at

12   least 15 occasions, and that on at least two occasions, most recently in June, 2007, checks her

13   owner tendered were returned for want of sufficient funds.

14   8.    Mr. Michael J. Ardelt, the General Manager of the Marina prior to the time

15   Plaintiff purchased the former owner's interest has informed PLAINTIFF that he has

16   personally seen an Agreement for Wharfage and Docking (the standardized contract used by

17   the Marina's former owner) that was signed by the owner of the DEFENDANT VESSEL,

18   Mr. Kurt Hatch, but Mr. Ardelt has been unable in spite of his good faith efforts to locate

19   said Agreement or a copy.  He further informed PLAINTIFF of his recollection and belief

20   that the Agreement for Wharfage and Docking that Mr. Hach signed was in substance

21   identical to Exhibit A hereto, and Exhibit A to the Declaration of Michael J. Ardelt

22   Concerning Existence of Month-to-Month Contract for Defendant Vessel, which is

23   concurrently filed herewith.  PLAINTIFF hence believes and herein alleges said facts.

24   9.    The Agreement for Wharfage and Docking (hereinafter the "Wharfage

25   Contract") is, by its own terms, a month-to-month contract, terminable by either party, as

26   paragraph 2 specifically provides that "Owner understands and agrees that this agreement

27   memorializes a month-to-month contract to provide mooring . . . . [and paragraph 5 provides

28   that] Owner understands

1    and agrees that this agreement may be terminated by either party upon written notice to the

2    other in such a manner so that the other party will receive said notice at least thirty (30) days

3    before said termination."

4        10.    The Wharfage Contract required the DEFENDANT VESSEL and her owner to

5    timely tender monthly payments for wharfage and other maritime services, and PLAINTIFF

6    alleges they failed to perform this payment duty.

7        11.    PLAINTIFF further alleges that, even if no written wharfage contract existed,

8    an implied freely terminable month-to-month wharfage contract existed between it on the one

9    hand and the DEFENDANT VESSEL and her owner on the other hand, as an indisputable

10    and here controlling industry standard exists within the Port of San Diego among privately

11    operated marinas pursuant to which marinas enter into freely terminable month-to-month

12    wharfage contracts, rather than long term wharfage contracts.

13        12.    PLAINTIFF alleges further that even if no written wharfage contract existed

14    and no controlling industry standard existed, a freely terminable implied wharfage contract

15    on month-to-month terms nevertheless exists between PLAINTIFF on the one hand and the

16    DEFENDANT VESSEL and her owner on the other hand, since California Civil Code

17    Section 1943 provides that "[a] hiring of real property, other than lodgings and dwelling-

18    houses, in places where there is no custom or usage on the subject, is presumed to be a

19    month-to-month tenancy unless otherwise designated in writing . . . ."

20        13.    PLAINTIFF is informed and believes that the owner of the DEFENDANT

21    VESSEL, Mr. Kurt Hach, has alleged that the DEFENDANT VESSEL sustained damage as

22    a result of misconduct engaged in by a Marina Manager that worked for the *former* owner of

23    the Marina, before her employment with the former owner was terminated.  Notwithstanding

24    that the claimed damage occurred literally *years before PLAINTIFF owned the Marina*, Mr.

25    Hach recently inexplicably demanded "$50,000 to $70,000" from PLAINTIFF in

26    compensation for such claimed damage.  PLAINTIFF is informed and believes and thereon

27    alleges the claimed damage occurring years before PLAINTIFF even owned the Marina

28    would, in any event, be barred by any potential statute of limitation and also by the equitable

1    doctrine of laches.

2        14.    After it purchased the Marina, in order to control risk and liability and for other

3    business reasons, PLAINTIFF carefully reviewed the existing circumstances and procedures

4    at the Marina and decided to make certain improvements and changes.  This included

5    examining the vessels at the Marina in order to generally evaluate their condition, verifying

6    that all vessels located at the Marina were insured, and preparing a new wharfage contract for

7    review and execution by vessel owners.

8        15.    It appeared, upon PLAINTIFF's examination, that the 40 year old

9    DEFENDANT VESSEL was (as she still is) in poor, unseaworthy condition, exhibiting

10   evidence of dry rot, years of growth on her bottom, blistering and peeling paint, with debris

11   scattered aboard.

12       16.    PLAINTIFF requested that all vessel owners for whom PLAINTIFF did not

13   have current evidence of vessel insurance, provide such evidence.  PLAINTIFF also

14   requested that vessel owners review and execute a new wharfage contract.  Although a few

15   boat owners failed to provide the requested proof of insurance or declined to execute the new

16   wharfage contract and moved their vessels to other locations, the vast majority of boat

17   owners complied with these requests, did not exercise their right to terminate their wharfage

18   contracts, and they remain today at the Marina as tenants in good standing.  After it

19   purchased the leasehold PLAINTIFF also dispatched a letter to all vessel owners, including

20   Mr. Hach, notifying them they were free to pick up a new Marina gate access card at the

21   Marina Office.  Although Mr. Hach claims to have attempted to do so, once at 7:00 a.m. and

22   again at 7:00 p.m., he did not and has not retrieved a new gate access card during normal

23   working Marina Office hours. .

24       17.    The owner of the DEFENDANT VESSEL (Mr. Hach) failed and refused to

25   provide evidence of insurance, and refused to execute and return the new wharfage contract,

26   apparently based on the notion that PLAINTIFF is somehow responsible for physical damage

27   to his vessel, notwithstanding that such damages (if any) occurred literally *years before*

28   *PLAINTIFF owned the Marina.*

FIRST AMENDED VERIFIED COMPLAINT FOR VESSEL ARREST,                                    -5-
INTERLOCUTORY SALE AND FOR MONEY DAMAGES FOR TRESPASS, BREACH OF,
CONTRACT FOR NECESSARIES AND QUANTUM MERUIT,                    Case No. 07CV2097L (BLM)

18.    As a consequence of the poor condition of the DEFENDANT VESSEL, her continuing lack of any maintenance whatever and her owner's refusal to both provide proof of insurance and to execute a new wharfage contract, PLAINTIFF became compelled to terminate the wharfage contract for the DEFENDANT VESSEL. Accordingly, on August 17, 2007 PLAINTIFF's counsel dispatched a letter via Certified U.S. Mail to Mr. Hach in which he was advised of the termination of his wharfage contract, effective 34 days from the date of the letter – on September 20, 2007. A true and correct copy is attached as Exhibit A to the Declaration of Philip E. Weiss in Support of Vessel Arrest, on file herein. This letter also explained the legal fiction indulged in admiralty that a vessel is a (juridical) person, and hence if the DEFENDANT VESSEL was not removed by the specified date she would become a trespasser and could be held accountable by way of a vessel arrest and subsequent interlocutory vessel sale. This letter also reminded Mr. Hach that any allegations he advanced concerning claimed damage to his vessel and financial and other misconduct by a marina manager employed by a former owner are not properly addressed by PLAINTIFF, the current owner of the Marina.

19.    On the date specified for termination of the wharfage contract (August 20, 2007) PLAINTIFF's counsel contacted Mr. Hach, the owner of the DEFENDANT VESSEL, to inquire as to why she had not been removed from the Marina, and in order to ascertain his intentions vis-a-vis removing her from the Marina. Mr. Hach did not agree to remove the DEFENDANT VESSEL. To the contrary, he insisted that if PLAINTIFF did not pay him $50,000 to $70,000, he would sue PLAINTIFF for $1.2 million. He also indicated that he believed that he would be unable to obtain another slip for his vessel, even if improved, "because Homeland Security will not permit him to move."

20.    Since September 21, 2007 the DEFENDANT VESSEL has occupied a slip at PLAINTIFF's private marina without permission, authority or legal justification.

21.    The DEFENDANT VESSEL, by and through her apparent and ostensible owner has intruded onto and continues to intrude onto PLAINTIFF's premises, thereby invading and interfering with PLAINTIFF's interest in the use, profits and enjoyment of its

FIRST AMENDED VERIFIED COMPLAINT FOR VESSEL ARREST,                                      -6-
INTERLOCUTORY SALE AND FOR MONEY DAMAGES FOR TRESPASS, BREACH OF,
CONTRACT FOR NECESSARIES AND QUANTUM MERUIT,                      Case No. 07CV2097L (BLM)

1 | waterfront business.

2 |     22.    The DEFENDANT VESSEL has not vacated PLAINTIFF's Marina, despite

3 | repeated demands, and she continues to occupy a slip at PLAINTIFF's Marina, without

4 | permission or authority of the PLAINTIFF, and in derogation of PLAINTIFF's interests in its

5 | real property.

6 |     23.    Accordingly, as a consequence of the foregoing, as of November 23, 2007

7 | PLAINTIFF has been damaged in a sum of not less than $5,769.60, the total of the arrearages

8 | on the date of termination of the wharfage contract ($1,929.60), plus $3,840.00 ($60.00 per

9 | day in transient wharfage fees beginning September 21, 2007 to November 23, 2007 (64

10 | days), calculated at the Marina's usual rate of $1.50 per foot per day), plus prejudgment

11 | interest, plus *custodia legis* expenses and all other costs of suit, no part of which has been

12 | paid.

### SECOND COUNT

**(Breach of Maritime Contract for Necessaries – Against All Defendants)**

15 |     24.    PLAINTIFF refers to Paragraphs 1 through 7 and 7 through 23 inclusive of this

16 | Verified Complaint, and incorporates them as though fully set forth herein.

17 |     25.    Whether pursuant to a written wharfage contract or an implied contract, the

18 | DEFENDANT VESSEL had an obligation, by and through her owner, to tender monthly

19 | wharfage payments, when due, for the provision of wharfage services. Such services

20 | constitute "necessaries" for purposes of the Commercial Instruments and Federal Maritime

21 | Lien Act (46 U.S.C. sections 31301, *et seq.*).

22 |     26.    PLAINTIFF competently provided these services for the benefit of the

23 | DEFENDANT VESSEL, and continues to do so, notwithstanding her current status as a

24 | trespasser.

25 |     27.    Whether written or implied, the wharfage contract between PLAINTIFF and

26 | the DEFENDANT VESSEL (and her owner) is freely terminable by either party upon

27 | providing the other with at least 30 days advance notice.

28 |     28.    PLAINTIFF's counsel provided 34 days' advance notice of the termination of

FIRST AMENDED VERIFIED COMPLAINT FOR VESSEL ARREST,           -7-
INTERLOCUTORY SALE AND FOR MONEY DAMAGES FOR TRESPASS, BREACH OF,
CONTRACT FOR NECESSARIES AND QUANTUM MERUIT,        Case No. 07CV2097L (BLM)

1  the wharfage contract in his letter to the owner of the DEFENDANT VESSEL, which letter

2  is dated August 17, 2007.

3        29.    The DEFENDANT VESSEL, by and through her owner, failed and refused,

4  and she continues to fail and refuse, to both to vacate the Marina following termination of her

5  wharfage contract, and to pay sums contractually due and payable pursuant to the Wharfage

6  Contract, and she thereby is in active breach of said Contract.

7        30.    Accordingly, as a consequence of the foregoing, as of November 23, 2007

8  PLAINTIFF has been damaged in a sum of not less than $5,769.60, the total of the arrearages

9  on the date of termination of the wharfage contract ($1,929.60), plus $3,840.00 ($60.00 per

10  day in transient wharfage fees beginning September 21, 2007 to November 23, 2007 (64

11  days), calculated at the Marina's usual rate of $1.50 per foot per day), plus prejudgment

12  interest, plus *custodia legis* expenses and all other costs of suit, no part of which has been

13  paid.

14                           **THIRD COUNT**

15            **(*Quantum Meruit* – Against Defendant Vessel)**

16        31.    PLAINTIFF refers to Paragraphs 1 through 7, Paragraphs 7 through 23 and

17  Paragraphs 25 through 30 inclusive of this Verified Complaint, and incorporates them as

18  though fully set forth herein

19        32.    PLAINTIFF provided valuable wharfage and other useful maritime necessaries

20  to the DEFENDANT VESSEL, for her benefit.

21        28.    Wharfage and other maritime necessaries were accepted by the DEFENDANT

22  VESSEL and her owner, and enjoyed by them.

23        29.    PLAINTIFF had and has a rightful expectation of payment for these maritime

24  services, but not been paid for them.

25        30.    Under the circumstances presented, not requiring payment for these services

26  would result in the unjust enrichment by the DEFENDANT VESSEL and her owner, which

27  hence justifies judgement in PLAINTIFF's favor on the basis of *quantum meruit*.

28        WHEREFORE, PLAINTIFF prays for process in due form of law and in

FIRST AMENDED VERIFIED COMPLAINT FOR VESSEL ARREST,               -8-
INTERLOCUTORY SALE AND FOR MONEY DAMAGES FOR TRESPASS, BREACH OF,
CONTRACT FOR NECESSARIES AND QUANTUM MERUIT,        Case No. 07CV2097L (BLM)

1 | accordance with the practices of this Honorable Court in cases of admiralty and maritime

2 | jurisdiction to be issued herein; that the DEFENDANT VESSEL be required to answer all

3 | and singular, the matters alleged above; that judgment be entered against the DEFENDANT

4 | VESSEL, *in rem*, for PLAINTIFF's damages in a sum according to proof, plus prejudgment

5 | interest, plus costs of suit (including attorneys' fees); that all persons interested in the

6 | DEFENDANT VESSEL, her engines, tackle, apparel, furniture and appurtenances, be cited

7 | to answer this Verified Complaint; that DEFENDANT VESSEL be seized pursuant to the

8 | Warrant of Arrest and condemned and sold to pay any judgment in favor of PLAINTIFF; and

9 | that it be awarded such other and further relief as this Honorable Court may deem just and

10 | proper.

11 | November 26, 2007                    Respectfully submitted,

12 |                                      WEISS & JONES

13 |

14 |                                      By _____

15 |                                      Philip E. Weiss, Esq.
                                         Attorneys for Plaintiff

16 |                                      Bartell Hotels, a California Limited
                                         Partnership, dba Half Moon Anchorage

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

FIRST AMENDED VERIFIED COMPLAINT FOR VESSEL ARREST,                                    -9-
INTERLOCUTORY SALE AND FOR MONEY DAMAGES FOR TRESPASS, BREACH OF,
CONTRACT FOR NECESSARIES AND QUANTUM MERUIT,                       Case No. 07CV2097L (BLM)

## VERIFICATION

I, RICHARD BARTELL, declare under penalty of perjury under the laws of the United States and the State of California as follows:

1.   I, the undersigned, am a General Partner of the Plaintiff in this action.

2.   I certify I have read the foregoing First Amended Verified Complaint and know its contents.

3.   The matters stated in the Verified Complaint are true of my own knowledge and belief except as to those matters stated on information and belief, and as to those matters, I believe them to be true.

Executed this 26 day of November, 2007 at San Diego, California.

Richard Bartell, Esq.

FIRST AMENDED VERIFIED COMPLAINT FOR VESSEL ARREST,
INTERLOCUTORY SALE AND FOR MONEY DAMAGES FOR TRESPASS, BREACH OF,
CONTRACT FOR NECESSARIES AND QUANTUM MERUIT,                    -10-

Case No. 07CV2097L (BLM)

Half Moon Anchorage

# AGREEMENT FOR WHARFAGE AND DOCKING

1. HALF MOON ANCHORAGE, hereinafter referred to as "Anchorage" hereby agrees to provide wharfage and docking to the following named person(s), hereinafter referred to as "Owner," for the following described vessel under the terms and conditions as set forth herein:

Registered Owner's name: [redacted] Home phone: [redacted]

Address: [redacted] Bus. phone: [redacted]

Legal Owner's name: [redacted]

Address: [redacted] State or Country Vessel Registered: [redacted]

Vessel's name: [redacted] Type of vessel: [redacted] Draft: [redacted]

Length (including bowsprit, bowplank, swimstep, vane and other protrusions): [redacted] Beam: [redacted]

Hull No.: ________ CF or Documentation No.: [redacted] Manufacturer or make: [redacted]

2. Owner understands and agrees that this agreement memorializes a month to month contract to provide mooring, berthage, dockage, wharfage and anchorage for the above described vessel only at the request of Owner, who warrants that he is the owner or co-owner of said vessel, and that said vessel will be berthed in slip number [redacted] of Anchorage. Further, Owner understands and agrees that the berthing space specified in this agreement or amendment thereto shall not be sublet and Owner will not allow another vessel other than the vessel specified in this agreement to occupy said berthing space without prior written permission of Anchorage. Further, Owner understands and agrees that no rights of Owner created in this agreement may be transferred or assigned without prior written approval of Anchorage. Further, Owner agrees that any such attempted transfer shall give Anchorage the right to terminate this agreement forthwith and that the sale, chartering, rental or other transfer of use of Owner's registered vessel shall automatically terminate this agreement. Further, that if the vessel berthed under this agreement is co-owned, the Owner executing this agreement hereby represents and warrants that he is authorized to bind all co-owners of the vessel in accordance with the terms of this agreement, and he will produce evidence of said authorization or secure co-owner's signature hereon within seven (7) days. Further, Owner agrees that during this agreement that Owner shall provide proof to Anchorage's satisfaction of ownership of said vessel upon demand of Anchorage.

3. Owner [redacted] covenants that in consideration of the [redacted] Paragraph 2 above he will pay to Anchorage the sum of $ [redacted] per month, or $ [redacted] per day for any fractional portion of a month, due and payable in advance on the first of each month. Owner further agrees that this berthing fee is subject to increase at Anchorage's discretion upon thirty (30) days written notice. Further, Owner agrees that said fee is based on the slip length or total length of vessel, including bowsprit, bowplank, swimstep, vane and any other protrusion, whichever is longest.

4. Owner understands and agrees to deposit with Anchorage a sum equal to the first month's berthing fee as and for a deposit toward any damages done to berth or slip by or on account of Owner that are unsatisfied upon termination of this agreement. Owner further agrees that said sum shall be added to by an amount equal to any increases in berthing fee at the time of such increase. Owner agrees that any unused portion of said deposit may be applied toward any unpaid berthing fees upon termination.

5. Owner understands and agrees that this agreement may be terminated by either party upon written notice to the other in such a manner so that the other party will receive said notice at least thirty (30) days before said termination. Upon such termination by either party, Owner agrees to remove the vessel within the notice period and should he fail to do so, Anchorage may cause same to be removed at the expense and for the account of Owner. Further, Owner understands and agrees that should he terminate and fail to give the aforesaid written notice he will pay to Anchorage a month's berthing fee beyond the end of any month that the vessel shall be removed.

6. Owner understands and agrees that when Owner's boat enters the Anchorage it immediately comes under the jurisdiction of the Anchorage and shall be berthed only where ordered, maneuvered as directed, and moored in a safe manner. All connections to Anchorage's electrical receptacles shall be grounded and all wiring leading from receptacles to vessel shall be in accordance with the posted rules and regulations of Anchorage. Owner expressly gives to Anchorage the right to move, relocate or change the position of his vessel when it is deemed necessary for the safety, convenience, and efficient utilization of the berthing of the Anchorage.

7. Owner understands, and agrees to abide by the requirement of Anchorage that all vessels while berthed at Anchorage are to be in a seaworthy, and fully operable condition, well painted, clean, sanitary, and in yacht condition for the benefit of fellow yachtsmen and slipmates. Further, Owner agrees to allow no part of Owner's vessel to extend over a main walkway or beyond the end of the berth without the prior written permission of Anchorage.

8. Owner agrees that he shall maintain and keep the area in and about the slip assigned him in as clean and sanitary condition as it was when leased. Owner agrees that he shall not store or permit to be stored any materials, equipment or other property on the floats, docks or premises other than within the confines of Anchorage furnished dock boxes. Owner further agrees that if he should fail to keep said area in a clean and sanitary condition that the Anchorage may at its sole discretion make said area clean and sanitary and Owner agrees to pay Anchorage for any and all costs of such labors. Owner further agrees to not store any flammables in dock boxes.

9. Owner agrees to abide by posted rules and regulations of Anchorage while operating the vessel and/or any power driven or noise making equipment on said vessel.

10. Owner agrees that he shall not allow any paint remover, burning of paint, or spraying of paint on the topside or above decks or to paint topside while in the rented space, except with Anchorage's express permission. Owner further agrees that he will not perform any major construction or repairs on vessel while at Anchorage docks and further, that Anchorage shall be the sole judge as to what constitutes "major construction or repairs."

11. Owner agrees that he, his family or guests shall not commit any acts of pollution or nuisance, including but not limited to the throwing, discharging or depositing from any vessel or float any refuse matter, oil, spirits, flammable liquid, or oily bilge into the water or upon the premises of the Anchorage or loud noise or music, etc. Owner further understands and agrees that only one parking space for Owner's personal vehicle is allocated per berthing space and that no motorhomes, trailers, or other oversize vehicles (over 19 ft.) are to be parked in the parking space without prior written consent of Anchorage. All guest vehicles, additional vehicles, and oversize vehicles (over 19 ft.) must park outside and off of Anchorage parking area. Anchorage reserves the right to issue parking stickers.

OVER

Rev. 8/87

EXHIBIT A

12. Owner agrees not to permit any dogs, cats or other such animals on the premises or the dock area without the prior specific written permission of Anchorage. Any such animals permitted on the premises or dock must be on a leash, and Owner shall be responsible for any clean up. Further, Owner understands and agrees that as a live-aboard, Owner shall not keep or maintain any such animals in or about the Anchorage.

13. Owner understands and agrees that Owner shall not live aboard his vessel nor shall he allow his family, guests, workers, or agents to live aboard his vessel except with the written permission of Anchorage. Living aboard shall not be construed to include weekends or holidays.

14. Owner agrees that without the prior specific written permission of Anchorage he shall not display for sale or lease signs nor shall he allow any solicitors, brokers, salesmen, or workmen, other than regular employees of Anchorage and full time paid hands regularly employed on said vessel, into Anchorage area to show or work on vessel without prior coordination with Anchorage's office. Owner understands that this limitation is for the protection of Owner's vessel and other vessels in the Anchorage.

15. Owner agrees that any vessel berthed at Anchorage is to be solely for pleasure and shall not be used for any commercial undertaking without Anchorage's specific permission in writing.

16. Owner agrees that a payment of any mooring, berthage, dockage, wharfage or anchorage fees, and related charges, received by Anchorage after the tenth (10th) of the month, shall be considered a late payment. Further, Owner understands that any checks returned for insufficient funds shall also be considered and treated as late payments. Further, Owner agrees that all late payments shall have added thereto as a late charge an amount equal to ten percent (10%) of the payment and shall be paid along with said late payment unless other arrangements are made with Anchorage. If not paid same will be added to the next month's rent. Further, Owner agrees that should Owner become thirty (30) days delinquent, that this lease shall be terminated on the thirty-first (31st) day and that thereafter Owner shall be charged storage at a rate per day equivalent to the daily berthing rate then prevailing for a visiting vessel of Owner's vessel's size. Further, Owner agrees that he shall pay any and all sums of money due and owing Anchorage by Owner for any reason whatsoever before the vessel described in Paragraph 1. of this agreement is removed from the assigned slip of Anchorage under a termination of this agreement. Further, Owner hereby pledges the aforedescribed vessel with Anchorage to secure payment of all accounts, debts, bills, and sums of money becoming due hereunder, and agrees that Anchorage shall have a specific lien on said vessel as security for any said amounts. Further, Owner agrees and acknowledges that Anchorage may, at its discretion, satisfy the aforesaid lien by sale as provided for in Section 500 et seq., and related sections, of the State of California Harbors and Navigation Code, or any similar United States Code or any successor Laws or Codes of the State of California or the United States of America.

17. Owner agrees that should Anchorage find it necessary to retain the services of a Lawyer to institute legal action to enforce or recover payment of any sums due under this agreement, Owner shall pay all Lawyer's fees and costs incurred by Anchorage.

18. Owner agrees that should he, his family or any agent, guest, or business visitor of Owner's cause any damage or loss to the Anchorage's buildings, yards, docks, or equipment, or that belonging to any customer of the Anchorage or guest thereof, or damage or loss to the person of any employee or customer of Anchorage or guest thereof, Owner shall be responsible for said damage or loss and to that end Owner agrees to carry Public Liability Insurance in an amount of $100,000.00 and $300,000.00 and property damage insurance in an amount of at least $50,000.00 and will provide proof of same to Anchorage upon request. That should said insurance not cover the cost of such repair or loss, then same shall become part of Owner's bill due Anchorage and be treated the same as any other sum or sums due under the terms of this agreement, and Owner agrees to hold Anchorage harmless for any of the aforesaid damages to other Owners' vessels and/or associated equipment.

19. Owner further agrees to hold Anchorage free from any and all liability for any property damages, theft, loss, or personal injuries suffered by owner, his family or guests or their property while using Anchorage's facilities, or caused by outside parties, storm or acts of God. Further, Owner hereby specifically releases Anchorage from any and all liability for any such damage to or destruction of Owner's vessel berthed hereunder or any of its equipment, fittings or fixtures, or injuries to Owner, his family or guests, from any cause resulting from the negligence of the Anchorage, its employees or agents.

20. Owner understands and acknowledges that Anchorage makes no warranties, express or implied, as to the suitability or condition of slips, floats, walks, gangways, ramps, buildings or any appurtenances thereto for Owner's specific vessel or needs, and that Owner enters into this agreement accepting the foregoing.

21. Owner shall notify the Anchorage when he expects his vessel to be away from its slip for any period in excess of one week. Owner understands and agrees that at any time Owner's vessel is absent for more than a one week period, Anchorage has the right to temporarily let Owner's vessel berthed hereunder or any of its equipment, fittings or fixtures, or injuries to Owner, his family or guests, from any cause resulting from the negligence of the Anchorage, its employees or agents.

22. Owner agrees to comply, and to cause his agents, employees, children and guests to comply with all posted rules and regulations of Anchorage as fully as though they were set forth herein, and should any such person breach any provision of this agreement or violate any posted rule or regulation, Anchorage may terminate this agreement immediately, remove the boat from her mooring space and store vessel either within or outside of Anchorage at Owner's risk and expense, and retake possession of the mooring space.

23. Owner and Anchorage agree that waiver of any condition herein is not to be considered a waiver of any other condition, nor a continuing waiver of the condition waived.

24. This agreement is not intended in any manner whatsoever to transfer the burdens or benefits of property ownership from Anchorage to the Owner.

25. OWNER AGREES THAT HE HAS READ AND APPROVED THIS AGREEMENT AND ACKNOWLEDGES RECEIPT OF A TRUE AND CORRECT COPY HEREOF.

Dated: _____

OWNER _____

HALF MOON ANCHORAGE

OWNER _____

by _____

OWNER _____

Owner's personal vehicle information:

1. Make: _____ Model: _____ Year: _____ Color: _____

   License No.: _____ State: _____ Registered to: _____

2. Make: _____ Model: _____ Year: _____ Color: _____

   License No.: _____ State: _____ Registered to: _____

EXHIBIT  *A*