WEISS & JONES
Philip E. Weiss, Esq. (No. 152523)
1551 Shelter Island Drive
San Diego, California 92106
Telephone: (619) 225-8884
Facsimile: (619) 225-8801

Attorneys for Plaintiff
Bartell Hotels, a California Limited Partnership,
dba Half Moon Anchorage
Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARTELL HOTELS, A California Limited Partnership, dba HALF MOON ANCHORAGE, <br><br>                   Plaintiff, <br><br> v. <br><br> M/Y CLAIRE IRENE, a 1968 Owens Motor Yacht of Approximately 40-Feet In Length And 11-Feet In Beam, Bearing California D.M.V. Registration No. CF 8646 ED, AND ALL OF HER ENGINES, TACKLE, ACCESSORIES, EQUIPMENT, FURNISHINGS AND APPURTENANCES, *in rem*, <br><br>                   Defendant. | Case No. 07 CV 2097 L (BLM) <br><br> IN ADMIRALTY <br><br> DECLARATION OF PHILIP E. WEISS IN SUPPORT OF PLAINTIFF'S MOTION FOR INTERLOCUTORY VESSEL SALE <br><br> Date: July 14, 2008 <br> Time: 10:30 a.m. <br> Judge: Hon. M. James Lorenz |

I, Philip E. Weiss, declare under penalty of perjury under the laws of the United States and the State of California as follows:

1.  I am counsel of record for the Plaintiff in this action, BARTELL HOTELS, dba HALF MOON ANCHORAGE. The following matters are within my personal knowledge except as to such matters stated on information and belief, and, as to such matters, I believe them to be true and correct.

2.  It is my understanding and belief, based on my discussions with Mr. Mike Ardeldt, the General Manager for the former owner of the marina at issue (now owned by PLAINTIFF) that he has personally seen an Agreement for Wharfage and Docking (the standardized contract used by

the Marina's former owner) (hereinafter the "Wharfage Contract") that was signed by the owner of the DEFENDANT VESSEL, Mr. Kurt Hatch, but Mr. Ardeldt has been unable to locate a the Wharfage Contract or a copy, in spite of his good faith efforts. He explains this at paragraph 8 of his Declaration of Michael J. Ardelt Concerning Existence of Month-to-Month Contract for Defendant, on file herein and previously offered in support of PLAINTIFF's (Second) Application for Issuance of Warrant for Vessel Arrest. An exemplar of the standard Wharfage Contract that I understand was used by the former owner of the marina is attached hereto as Exhibit A (and is also Exhibit A to the Verified First Amended Complaint).

3. The Wharfage Contract clearly provides for the free termination by either party upon 30 days' advance notice to the other, as it provides at paragraph 5 that: "Owner understand and agrees that this agreement may be terminated by either party upon written notice to the other in such manner so that the other party will receive said notice at least thirty (30) days before said termination." I believe that even if no written Wharfage Contract existed, the parties would, for two reasons, still be free to terminate the implied contract upon 30 days' advance notice. First, California Civil Code Section 1943 specifically provides that "[a] hiring of real property, other than lodgings and dwelling-houses, in places where there is no custom or usage on the subject, is presumed to be a month-to-month tenancy unless otherwise designated in writing . . . ." Second, in ascertaining terms of an implied contract it is proper and reasonable to conclude that the parties' intention was consistent with the prevailing standard in the industry. Here, I can and do attest that the industry standard in San Diego is extremely well established. For more than a decade I have represented all or nearly all marinas in San Diego, and several others located in the Central District, and have accordingly been involved in literally hundreds of matters involving the termination of wharfage contracts. I am therefore aware that virtually all of the slips in San Diego are provided on a month-to-month basis. I am aware of only one marina in San Diego that occasionally permits a wharfage contract term of one year. The reason for this industry standard is, I believe, manifest – it permits marina owners (and boat owners, for that matter) to decide the relationship is not a good fit, for almost any reason, and to easily and quickly terminate the relationship.

///

4. In August, 2007 PLAINTIFF informed me that, as a consequence of the poor condition of the DEFENDANT VESSEL, her continuing lack of any maintenance whatever and her owner's refusal to both provide proof of insurance and to execute a new wharfage contract, PLAINTIFF has no realistic option but to terminate the wharfage contract for the DEFENDANT VESSEL. Accordingly, on August 17, 2007 I mailed a letter via Certified U.S. Mail to Mr. Hach, in which I informed him of the termination of his Wharfage Contract, effective 34 days from the date of the letter – on September 20, 2007. The 34 day period included 30 days notice required by the Wharfage Contract (and Cal. Civ. Code section 1943, in the event no written Wharfage Contract existed), plus four days to account for transit time in the mails. A true and correct copy of this letter is attached hereto as Exhibit B.

5. On the date specified for termination of the wharfage contract (August 20, 2007) I telephoned Mr. Hach, the owner of the DEFENDANT VESSEL, to inquire as to why she had not been removed from the Marina, and in order to ascertain his intentions vis-a-vis removing her from the Marina. Mr. Hach did not agree to remove the DEFENDANT VESSEL. To the contrary, he insisted that if PLAINTIFF did not pay him $50,000 to $70,000, (apparently for "damages" he believes his vessel sustained as a result of claimed misconduct several years ago by a Marina Manager who was employed by the former owner of the marina), he would "sue PLAINTIFF for $1.2 million."

6. Mr. Hach also informed during the above referenced telephone conversation that he would be unable to obtain another slip for his vessel "because Homeland Security will not permit him to move." This claim is inexplicable. I have been practicing maritime law in San Diego for approximately 16 years and have taught this subject for 10 years Adjunct Professor, and I am unaware of any restriction imposed by "Homeland Security" (or any other agency) that would prevent or inhibit a boat owner from moving his or her vessel to a new berthing location.

7. I have been informed and believe that a Marina Manager employed by the entity that owned the marina prior to PLAINTIFF purchasing it (Ms. Ann Miller) was terminated and criminally prosecuted in connection with her scheme to divert to herself wharfage fees and other monies that were due to her employer. I have no way of knowing whether Mr. Hach was a victim of Ms. Miller's

misconduct, which occurred prior to the time PLAINTIFF owned the marina.

8.    During the course of my career I have represented maritime lien holders in dozens vessel arrest actions brought in the United States District Court for the Southern District of California. I typically arrest two to five vessels per year in the Southern District. In addition, I represent several boat yards in San Diego that routinely serve as Court-appointed Substitute Custodians. Based on these experiences, including other pending vessel arrest actions in the Southern District, that the prevailing rate for custodial services in the Port of San Diego is not less than $12.50 per foot per month for wharfage and 50 cents per foot per day for custodial services (daily checks of the DEFENDANT VESSEL, including her mooring lines, orientation in the water and to confirm she has sustained obvious damage), plus $50.00 per week for more detailed vessel inspections, including such tasks as confirming that bilges do not have excessive water, checking that dewatering pumps (if equipped) remain sufficiently functional to pump out any accumulated water in the bilges, inspecting the interior for damage or other problems that should be brought to the parties' attention, and confirming shore power (if any) remains properly connected. The above rates are the lowest Substitute Custodian rates I am aware of in the Southern District of California.

Executed this 15th day of May, 2008 at San Diego, California.

                    s/Philip E. Weiss

Attorneys for Plaintiff
Bartell Hotels, a California Limited
Partnership, dba Half Moon Anchorage
E-mail: shiplaw@earthlink.net

## Table of Contents / Exhibits

| Exhibit | Description | Pages |
|---------|-------------|-------|
| A | Agreement For Wharfage and Docking | A1-A2 |
| B | Termination of Wharfage Contract Letter | B1-B2 |

11/19/2007 01:23 FAX  6192251604

☑002/002



# Half Moon Anchorage

## AGREEMENT FOR WHARFAGE AND DOCKING

1. HALF MOON ANCHORAGE, hereinafter referred to as "Anchorage" hereby agrees to provide wharfage and docking to the following named person(s), hereinafter referred to as "Owner," for the following described vessel under the terms and conditions as set forth herein:

Registered Owner's name: ~~████~~  Home phone: ~~████~~
Address: ~~████~~  Bus. phone: ~~████~~
Legal Owner's name: ~~████~~
Address: ~~████~~  State or Country Vessel Registered: ~~████~~
Vessel's name: ~~████~~  Type of vessel: ~~████~~  Draft: ~~████~~
Length (including bowsprit, bowplank, swimstep, vane and other protrusions): ~~████~~  Beam: ~~████~~
Hull No.: ~~████~~  CF or Documentation No.: ~~████~~  Manufacturer or make: ~~████~~

2. Owner understands and agrees that this agreement memorializes a month to month contract to provide mooring, berthage, dockage, wharfage and anchorage for the above described vessel only at the request of Owner, who warrants that he is the owner or co-owner of said vessel, and that said vessel will be berthed in slip number ~~████~~ of Anchorage. Further, Owner understands and agrees that the berthing space specified in this agreement or amendment thereto shall not be sublet and Owner will not allow another vessel other than the vessel specified in this agreement to occupy said berthing space without prior written permission of Anchorage. Further, Owner understands and agrees that no rights of Owner created in this agreement may be transferred or assigned without prior written approval of Anchorage. Further, Owner agrees that any such attempted transfer shall give Anchorage the right to terminate this agreement forthwith and that the sale, chartering, rental or other transfer of use of Owner's registered vessel shall automatically terminate this agreement. Further, that if the vessel berthed under this agreement is co-owned, the Owner executing this agreement hereby represents and warrants that he is authorized to bind all co-owners of the vessel in accordance with the terms of this agreement, and he will produce evidence of said authorization or secure co-owner's signature hereon within seven (7) days. Further, Owner agrees that during this agreement that Owner shall provide proof to Anchorage's satisfaction of ownership of said vessel upon demand of Anchorage.

3. Owner agrees and covenants that in consideration of the berthing provided in Paragraph 2 above he will pay to Anchorage the sum of $ ~~████~~ per month, or $ ~~████~~ per day for any fractional portion of a month, due and payable in advance on the first of each month. Owner further agrees that this berthing fee is subject to increase at Anchorage's discretion upon thirty (30) days written notice. Further, Owner agrees that said fee is based on the slip length or total length of vessel, including bowsprit, bowplank, swimstep, vane and any other protrusion, whichever is longest.

4. Owner understands and agrees to deposit with Anchorage a sum equal to the first month's berthing fee as and for a deposit toward any damages done to berth or slip by or on account of Owner that are unsatisfied upon termination of this agreement. Owner further agrees that said sum shall be added to by an amount equal to any increases in berthing fee at the time of such increase. Owner agrees that any unused portion of said deposit may be applied toward any unpaid berthing fees upon termination.

5. Owner understands and agrees that this agreement may be terminated by either party upon written notice to the other in such a manner so that the other party will receive said notice at least thirty (30) days before said termination. Upon such termination by either party, Owner agrees to remove the vessel within the notice period and should he fail to do so, Anchorage may cause same to be removed at the expense and for the account of Owner. Further, Owner understands and agrees that should he terminate and fail to give the aforesaid written notice he will pay to Anchorage a month's berthing fee beyond the end of any month that the vessel shall be removed.

6. Owner understands and agrees that when Owner's boat enters the Anchorage it immediately comes under the jurisdiction of the Anchorage and shall be berthed only where ordered, maneuvered as directed, and moored in a safe manner. All connections to Anchorage's electrical receptacles shall be grounded and all wiring leading from receptacles to vessel shall be in accordance with the posted rules and regulations of Anchorage. Owner expressly gives to Anchorage the right to move, relocate or change the position of his vessel when it is deemed necessary for the safety, convenience, and efficient utilization of the berthing of the Anchorage.

7. Owner understands, and agrees to abide by the requirement of Anchorage that all vessels while berthed at Anchorage are to be in a seaworthy, and fully operable condition, well painted, clean, sanitary, and in yacht condition for the benefit of fellow yachtsmen and slipmates. Further, Owner agrees to allow no part of Owner's vessel to extend over a main walkway or beyond the end of the berth without the prior written permission of Anchorage.

8. Owner agrees that he shall maintain and keep the area in and about the slip assigned him in as clean and sanitary condition as it was when leased. Owner agrees that he shall not store or permit to be stored any materials, equipment or other property on the floats, docks or premises other than within the confines of Anchorage furnished dock boxes. Owner further agrees that if he should fail to keep said area in a clean and sanitary condition that the Anchorage may at its sole discretion make said area clean and sanitary and Owner agrees to pay Anchorage for any and all costs of such labors. Owner further agrees to not store any flammables in dock boxes.

9. Owner agrees to abide by posted rules and regulations of Anchorage while operating the vessel and/or any power driven or noise making equipment on said vessel.

10. Owner agrees that he shall not allow any paint remover, burning of paint, or spraying of paint on the topside or above decks or to paint topside while in the rented space, except with Anchorage's express permission. Owner further agrees that he will not perform any major construction or repairs on vessel while at Anchorage docks and further, that Anchorage shall be the sole judge as to what constitutes "major construction or repairs."

11. Owner agrees that he, his family or guests shall not commit any acts of pollution or nuisance, including but not limited to the throwing, discharging or depositing from any vessel or float any refuse matter, oil, spirits, flammable liquid, or oily bildge into the water or upon the premises of the Anchorage or loud noise or music, etc. Owner further understands and agrees that only one parking space for Owner's personal vehicle is allocated per berthing space and that no motorhomes, trailers, or other oversize vehicles (over 19 ft.) are to be parked in the parking space without prior written consent of Anchorage. All guest vehicles, additional vehicles, and oversize vehicles (over 19 ft.) must park outside and off of Anchorage parking area. Anchorage reserves the right to issue parking stickers.



Page A1

Rev. 8/87

EXHIBIT **A**

12. Owner agrees not to permit any dogs, cats or other such animals on the premises or the dock area without the prior specific written permission of Anchorage. Any such animals permitted on the premises or dock must be on a leash, and Owner shall be responsible for any clean up. Further, Owner understands and agrees that as a live-aboard, Owner shall not keep or maintain any such animals in or about the Anchorage.

13. Owner understands and agrees that Owner shall not live aboard his vessel nor shall he allow his family, guests, workers, or agents to live aboard his vessel except with the written permission of Anchorage. Living aboard shall not be construed to include weekends or holidays.

14. Owner agrees that without the prior specific written permission of Anchorage he shall not display for sale or lease signs nor shall he allow any solicitors, brokers, salesmen, or workmen, other than regular employees of Anchorage and full time paid hands regularly employed on said vessel, into Anchorage area to show or work on vessel without prior coordination with Anchorage's office. Owner understands that this limitation is for the protection of Owner's vessel and other vessels in the Anchorage.

15. Owner agrees that any vessel berthed at Anchorage is to be solely for pleasure and shall not be used for any commercial undertaking without Anchorage's specific permission in writing.

16. Owner agrees that a payment of any mooring, berthage, dockage, wharfage or anchorage fees, and related charges, received by Anchorage after the tenth (10th) of the month, shall be considered a late payment. Further, Owner understands that any checks returned for insufficient funds shall also be considered and treated as late payments. Further, Owner agrees that all late payments shall have added thereto as a late charge an amount equal to ten percent (10%) of the payment and shall be paid along with said late payment unless other arrangements are made with Anchorage. If not paid same will be added to the next month's rent. Further, Owner agrees that should Owner become thirty (30) days delinquent, that this lease shall be terminated on the thirty-first (31st) day and that thereafter Owner shall be charged storage at a rate per day equivalent to the daily berthing rate then prevailing for a visiting vessel of Owner's vessel's size. Further, Owner agrees that he shall pay any and all sums of money due and owing Anchorage by Owner for any reason whatsoever before the vessel described in Paragraph 1. of this agreement is removed from the assigned slip of Anchorage under a termination of this agreement. Further, Owner hereby pledges the aforedescribed vessel with Anchorage to secure payment of all accounts, debts, bills, and sums of money becoming due hereunder, and agrees that Anchorage shall have a specific lien on said vessel as security for any said amounts. Further, Owner agrees and acknowledges that Anchorage may, at its discretion, satisfy the aforesaid lien by sale as provided for in Section 500 et seq., and related sections, of the State of California Harbors and Navigation Code, or any similar United States Code or any successor Laws or Codes of the State of California or the United States of America.

17. Owner agrees that should Anchorage find it necessary to retain the services of a Lawyer to institute legal action to enforce or recover payment of any sums due under this agreement, Owner shall pay all Lawyer's fees and costs incurred by Anchorage.

18. Owner agrees that should he, his family, any agent, guest, or business visitor of Owner's cause any damage or loss to the Anchorage's buildings, yards, docks, or equipment, or that belonging to any customer of the Anchorage or guest thereof, or damage or loss to the person of any employee or customer of Anchorage or guest thereof, Owner shall be responsible for said damage or loss and to that end Owner agrees to carry Public Liability Insurance in an amount of $100,000.00 and $300,000.00 and property damage insurance in an amount of at least $50,000.00 and will provide proof of same to Anchorage upon request. That should said insurance not cover the cost of such repair or loss, then same shall become part of Owner's bill due Anchorage and be treated the same as any other sum or sums due under the terms of this agreement, and Owner agrees to hold Anchorage harmless for any of the aforesaid damages to other Owners' vessels and/or associated equipment.

19. Owner further agrees to hold Anchorage free from any and all liability for any property damages, theft, loss, or personal injuries suffered by owner, his family or guests or their property while using Anchorage's facilities, or caused by outside parties, storm or acts of God. Further, Owner hereby specifically releases Anchorage from any and all liability for any such damage to or destruction of Owner's vessel berthed hereunder or any of its equipment, fittings or fixtures, or injuries to Owner, his family or guests, from any cause resulting from the negligence of the Anchorage, its employees or agents.

20. Owner understands and acknowledges that Anchorage makes no warranties, express or implied, as to the suitability or condition of slips, floats, walks, gangways, ramps, buildings or any appurtenances thereto for Owner's specific vessel or needs, and that Owner enters into this agreement accepting the foregoing.

21. Owner shall notify the Anchorage when he expects his vessel to be away from its slip for any period in excess of one week. Owner understands and agrees that at any time Owner's vessel is absent for more than a one week period, Anchorage has the right to temporarily let Owner's assigned slip with no credit applied to Owner's monthly rental during the vessel's absence.

22. Owner agrees to comply, and to cause his agents, employees, children and guests to comply with all posted rules and regulations of Anchorage as fully as though they were set forth herein, and should any such person breach any provision of this agreement or violate any posted rule or regulation, Anchorage may terminate this agreement immediately, remove the boat from her mooring space and store vessel either within or outside of Anchorage at Owner's risk and expense, and retake possession of the mooring space.

23. Owner and Anchorage agree that waiver of any condition herein is not to be considered a waiver of any other condition, nor a continuing waiver of the condition waived.

24. This agreement is not intended in any manner whatsoever to transfer the burdens or benefits of property ownership from Anchorage to the Owner.

25. OWNER AGREES THAT HE HAS READ AND APPROVED THIS AGREEMENT AND ACKNOWLEDGES RECEIPT OF A TRUE AND CORRECT COPY HEREOF.

Dated: _____

OWNER _____

HALF MOON ANCHORAGE

OWNER _____

by _____

OWNER _____

Owner's personal vehicle information:

1. Make: _____ Model: _____ Year: _____ Color: _____

   License No.: _____ State: _____ Registered to: _____

2. Make: _____ Model: _____ Year: _____ Color: _____

   License No.: _____ State: _____ Registered to: _____

Page A2

EXHIBIT A



August 17, 2007

7007 0220 0003 4356 2412

Mr. Kurt Hach
19918 Chase Street
Canoga Park, California 91306

Via Certified U.S. Mail
And First Class U.S. Mail

Re: Half Moon Anchorage v. M/Y CLAIRE IRENE
Termination of Wharfage Contract, Failure to Return Written Contract, Etc.

Dear Mr. Hach:

I represent Half Moon Anchorage in connection with the referenced matter. I have inspected the exterior of your vessel and personally confirmed she is apparently in quite poor and possibly unseaworthy and unsafe condition. She is an old vessel largely of wooden construction and she unfortunately exhibits evidence of serious dry rot, among other problems. I understand that on one prior occasion your vessel took on so much water the marina staff was forced to intervene and dewater the boat, to save her from sinking.

In addition, several weeks ago copies of Contracts for Private Wharfage were mailed to boat owners who did not have written contracts in place. Unfortunately, you have failed to sign this contract and return it, as was requested. Having a written contract in place is now absolutely required. Moreover, every marina in San Diego requires that boat owners maintain insurance, and our files are devoid of evidence your vessel is in fact insured.

As no written contract is in place, the contract is as implied and may statutorily be terminated by either party upon 30 days' advance written notice to the other. I understand that, at least recently, you have had a good payment history and my client appreciates this. However, I trust you understand that in the light of the foregoing facts, **I am compelled to notify you of the termination of your implied wharfage contract, effective 34 days from the date of this letter – on September 20, 2007**. Please note I have allowed four days more than required by statute, to account for the typical mail delay in your receiving this letter.

Of course, if you rehabilitate your vessel you will be free to apply for a slip, but in such event you will be required, like all boat owners, to execute a written Contract for Private Wharfage, assuming the application is approved. I trust you understand and appreciate why my client has become obliged to terminate your contract. Please also understand that this is a matter of utmost urgency and importance to my client, and that it is absolutely *imperative that you remove your vessel no later than the above specified date*. You should also understand that pursuant to well established admiralty law, a vessel that occupies a slip without contractual or other legal authority does so in the capacity of a trespasser.

Maritime law indulges the legal fiction that a vessel is a person, and accordingly where a vessel fails to pay a debt or commits a tort (such as a trespass) a maritime lien arises against the offending vessel, and she may be held accountable for such liens, in addition to the liability of the

Philip E. Weiss ▼ *San Diego County Office*
1551 Shelter Island Drive ▼ San Diego, California 92106
619.225.8884 ▼ Fax 619.225.8801
e-mail: pweiss@weissjones.com

Page B1

George M. Jones ▼ *Los Angeles County Office*
429 Shoreline Village Drive, Suite N ▼ Long Beach, California 90802
562.435.9501 ▼ Fax 562.435.9581
e-mail: gjones@weissjones.com

EXHIBIT B

www.weissjones.com

vessel owner. Vessels are held accountable by way of a vessel arrest by the U.S. Marshal, pursuant to an Order of the U.S. District Court. In meritorious vessel arrest cases the arresting party is entitled to recover on its lien, plus all of the typically substantial costs associated with the vessel arrest. This is horn book law for experienced maritime lawyers. I mention this remedy only for purposes of education, as we hope and expect that you will vacate your vessel by the above specified date.

I am aware of unsupported and unsupportable claims you made when the marina was under former ownership. Such claims have, in any event, no bearing whatever on my client's rights, as above explained. I cannot forcefully enough stress the importance that you remove your vessel by the above stated date. If you have any questions or comments, please do not hesitate to call me. I would ask that now that this matter has been referred to me for handling, you refrain from contacting my client's Marina Manager or other of its employees concerning this matter.

Your vessel has classic lines that many appreciate. I hope you are able to restore her to presentable and seaworthy condition, and that you enjoy her at what ever marina, mooring or other location you move her to. With thanks in advance for your anticipated attention to this most important matter, I remain

Sincerely,

Philip E. Weiss

cc:     Client